UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JOSEPH HARRISON,

                Plaintiff,               **MEMORANDUM & ORDER**
                                            CV 04-2033 (WDW)

      -against-

NORTH SHORE UNIVERSITY HOSPITAL,

                Defendant.
-----------------------------------------------------------X
**APPEARANCES:**
Law Offices of Frederick K. Brewington
50 Clinton Street, Suite 501
Hempstead, NY 11550
Gregory Calliste, Jr., Esq., Attorney for Plaintiff

Epstein Becker & Green, PC
250 Park Avenue
New York, NY 10117-0077
David O. Simon, Esq., James D. Williams, Jr., Esq., Attorneys for Defendant

**WALL, Magistrate Judge:**

      Before the court, on consent of the parties, is a motion for summary judgment made by

defendant North Shore University Hospital ("NSUH"). *See* Docket Entry ("DE") [50]. Plaintiff

Joseph Harrison has opposed the motion. Previously, District Judge Wexler issued a

Memorandum and Order (M&O) granting in part and denying in part defendant's motion to

dismiss.[1] M&O of September 15, 2005, DE [35]. Plaintiff's remaining claims under Title VII of

the Federal Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, ("Title VII")

are failure to promote to the MRI department in October 2000,[2] hostile work environment,

---

      [1]The parties consented to the jurisdiction of the undersigned for all purposes on June 7,
2006.

      [2]The M&O dismissed plaintiff's other failure to promote claims without prejudice to
plaintiff amending his complaint following "adequate discovery." As plaintiff has taken no

retaliation, and wrongful termination. For the reasons set forth herein, the motion is granted.

## BACKGROUND

The material facts, drawn from the Amended Complaint and the parties' Rule 56.1 Statements, are undisputed unless otherwise noted.

Plaintiff Joseph Harrison, Jr. ("Harrison"), an African American male, was hired by NSUH as a Radiology Technologist in the Department of Radiology around June 1987. After receiving training, plaintiff elected to work the evening shift from 4:00 p.m. to 12:00 a.m. In June 1990, plaintiff was promoted to a higher paying position as a CT Scan Technologist ("CT Tech"). Plaintiff claims that he was not required to submit an application for this transfer despite defendant's position that written applications must be submitted for all transfers. Plaintiff's Rule 56.1 Counter Statement ("Pl. Stmt") ¶13, DE [63]. After additional training, plaintiff again elected to work the evening shift. During his tenure as a CT Tech, his immediate supervisor was Karen Lisk, CT Supervisor; his second level supervisor was Chief Technologist Charles Winterfeldt; and his third level supervisor was the Director of Radiology. The position of Director of Radiology was held by Richard Buckheit until 1993, and by John Aloisio from 1994 through plaintiff's termination on November 15, 2000.

Harrison claims that subsequent to his promotion to CT Tech, he sought further promotions[3] to an MRI position by stating his interest verbally to supervisors. Pl. Stmt, ¶¶ 15-17.

_____

action to amend his complaint in this regard, the failure to promote claim is limited to the extent indicated in the M&O.

[3]While plaintiff claims a move from CT Tech to MRI Tech constituted a promotion, defendant claims it would be a lateral transfer. For purposes of this motion, the court will refer to this move as a promotion.

Plaintiff claims that during his tenure at NSUH, twelve white or Hispanic, less qualified, employees received promotions to MRI. Am. Compl. ¶68, DE [12]. Even after conducting discovery, plaintiff has provided no specific dates that these promotions occurred and thus, the only failure to promote event currently at issue is the one identified in Judge Wexler's M&O–defendant's decision to promote Carlos Sandoval. According to plaintiff, Sandoval was promoted to MRI in October 2000. Am. Compl. ¶66. NSUH has provided an affidavit and a transfer form indicating that the decision to transfer Sandoval to MRI was made in September 1998 with an effective date of January 1999. Aloisio Aff., Ex. 12, DE [58].

In addition to plaintiff's claims that he was passed over for promotions for discriminatory reasons, he claims that he was subjected to a hostile work environment. Generally, plaintiff feels he was mistreated by his immediate supervisor, Karen Lisk, that she made false accusations against him, and that she reprimanded him for conduct such as returning late from breaks but did not reprimand non-African American employees for the same conduct. Pl. Stmt ¶¶ 40-52. Lisk allegedly referred to plaintiff as a "'boy' in a racially derogatory manner on at least two separate occasions" in 1989 and 1990. Id. at ¶56 (citing Harrison Tr., 143:25). Plaintiff alleges he was unfairly evaluated by Lisk. Harrison Tr., 142:11-13. Lisk's last evaluation of plaintiff was completed in 1995. Lisk Aff., ¶7, DE [59]. Plaintiff also refers to an incident in 1995 regarding Lisk's reaction to news of a death in plaintiff's family. Pl. Stmt ¶¶ 54-55. Another incident involving Lisk's marking of plaintiff's timesheets occurred in approximately 1998. Harrison Tr., 226:5-15. Plaintiff also claims he was unfairly denied overtime opportunities, but admits that the problem was resolved in 1993. Id. at 153:5-7.

In addition, Harrison claims to have been verbally abused by hospital security guards who

destroyed his cars and other personal property. Pl. Stmt. ¶62. Security guards also allegedly talked about his cars and referred to him as a "Drug Dealer." *Id.* ¶64. Plaintiff alleges that he complained about the security office to numerous administrators, including NSUH's Deputy Executive Director Robert Gallagher, but nothing was done. *Id.* ¶ 67. Plaintiff states that defendant failed to adequately investigate his claims and in one instance in 1996, forced him to attend anger management counseling. Harrison Tr., 306:19-307:2. Although plaintiff notes several other examples of his run-ins with members of Security at the hospital, the last such incident specifically cited by plaintiff occurred in late 1996. Pl. Stmt ¶¶69-72.

Plaintiff has not identified any specific discriminatory actions that took place between December 1998 and October 2000. Plaintiff generally mentions defendant's failure to promote him to an MRI position, but does not provide specific dates for those occurrences. He has stated that he was passed over in favor of Carlos Sandoval in October 2000. Defendant has identified several incidents leading up to plaintiff's termination in November 2000. On November 25, 1997, Charles Winterfeldt, plaintiff's second level supervisor, sent a memorandum to John Aloisio regarding an incident with plaintiff the day before. Winterfeldt Aff., Ex. 1, DE [57]. According to Winterfeldt, when he approached plaintiff to inquire why he had been forty minutes late to work the day before, plaintiff became "verbally loud and repeatedly used inappropriate language" that Winterfeldt further characterized as "inappropriate, <u>threatening verbal behavior</u>." *Id.* (emphasis in original). Plaintiff acknowledges that he "might have cursed at him" but denies that his reaction was threatening since "I never said I was going to harm him." Harrison Tr., 47:12, 48:6-7.

In May 2000, Dr. Kenneth Nalaboff, Chief Resident of the Radiology Department,

complained to the senior technologist about what he believed to be a mistake made by plaintiff during a CT scan. Dr. Nalaboff subsequently prepared an Incident Report concerning plaintiff's reaction to his concerns. See Aloisio Aff., Ex. 5. According to Dr. Nalaboff, plaintiff "proceeded to yell and verbally assault me and assumed a hostile physical stance. Although he never physically touched me, I felt physically threatened by him and told him so. He was insulting, unprofessional, and altogether inappropriate." *Id.* Plaintiff disputes that he was abusive or threatening and says a co-worker, Kahron Hogans, witnessed the incident and "wrote his own thing to this." Harrison Tr., 232:8-9. In opposition to this motion, however, plaintiff has not provided a sworn copy of Mr. Hogans's report or an affidavit or deposition testimony from him. Plaintiff does provide an undated, unsigned statement addressed to "whom it may concern" which purports to be Hogans's account. Calliste Decl., Ex. F. Even assuming that this evidence is admissible, an unlikely event, the "statement" is limited to Hogans's observation of Dr. Nabaloff's behavior only and does not describe the incident between Nabaloff and plaintiff.

In July 2000, plaintiff was the subject of a report from another doctor, Robin Warshawsky. Warshawsky Aff., Ex. A, DE [55]. Dr. Warshawsky initiated a conversation with Harrison after she "heard Joe and the patient speaking to one another in a loud voice." *Id.* At the conclusion of her report, Dr. Warshawsky states "I have never been spoken to by anyone in such a hostile and disrespectful way as I was on July 14th by Joe Harrison." *Id.* Again, plaintiff disputes Dr. Warshawsky's account of the incident, says he has a witness, employee Laura Blacknall, who supports him, yet fails to provide an affidavit or deposition testimony from that witness. Harrison Tr., 239-40:5-19. It does not appear that any action was taken against plaintiff as a direct result of the incidents involving Drs. Nalaboff and Warshawsky.

The incident that led to plaintiff's termination occurred on November 15, 2000. On that date, plaintiff went to the Human Resources office to ask for a new identification badge ("ID"). Plaintiff claims one of his two ID badges had been stolen, that he always carried two ID badges, and that defendant was aware of this fact. Pl. Stmt ¶¶93-95. Plaintiff acknowledged that he kept one ID on his lab coat and a second in his car "for New York City police officers, because I was being harassed going home driving my BMW." Harrison Tr., 313:11-13. At the office, he approached Desiree Wharton, a black woman of West Indian descent, and asked for an ID badge. Wharton informed him that hospital policy only allowed for the issuance of one ID badge. According to Wharton, he "became agitated and began raising his voice, stating that he has always carried two badges and it has never been a problem." Wharton Aff., ¶3, DE [54]. The parties disagree as to what plaintiff said next. According to Wharton, plaintiff said "There's a lot of racism in this Hospital . . . You're a nigger and I'm a nigger." *Id.* at ¶5. Kathleen Hellman, Office Manager of Human Resources, supports Ms. Wharton's account and claims that:

> Mr. Harrison pointed his finger in Ms. Wharton's face, called Ms. Wharton a "nigger," and stated that Ms. Wharton should understand how he feels as another black person. I instructed Mr. Harrison to apologize to her. Mr. Harrison refused and was yelling in a very loud voice. Ms. Wharton was very upset by Mr. Harrison's comments and was visibly shaken.

Hellman Aff. ¶5, DE [56]. Ms. Wharton also states that she was "very disturbed and shaken" by plaintiff's comments and "felt intimidated and threatened." Wharton Aff. ¶6. On the day of the incident, Wharton made a report to Security which indicated that she "was physically upset by the incident [and] was escorted to her vehicle by Security staff." *Id.,* Ex. A.

Mr. Harrison acknowledges that he used the word "nigger" during the exchange, but only in reference to himself: "I said 'I know that I'm a nigger. You understand? And basically you're

just like me.' But I never called her a nigger." Harrison Tr. 324:3-6. Plaintiff claims that his use

of the word was appropriate "being I was talking to two black people, I wanted them to

understand where I was coming from, that we're in an all white environment, and I'm being

stepped over." *Id.* at 324-25:23-4. Plaintiff claims that Elaine Johnson, an African American

employee present during the incident, would corroborate his version; however, plaintiff has yet

again failed to provide an affidavit or deposition testimony from the witness.

Later that same day, Director of Human Resources Paul Giordano called Harrison to his

office to discuss the incident. After plaintiff admitted to using the word "nigger," Giordano

directed him to apologize to Wharton, but he refused. Harrison Tr. 338:14-25. Plaintiff claims

that Giordano was trying to provoke him into a physical confrontation. *Id.* at 338:8-21. After

Harrison declared "'I'm not apologizing to nobody,'" Giordano suspended him. *Id.* at 341:8-14.

In response to what he characterizes as Giordano lunging at him, Harrison said "if you touch me,

it's going to be on." *Id.* at 341:16-18.

The same day, Giordano reported to John Aloisio, Director of Radiology, that Harrison

had acted in an unprofessional and threatening manner towards himself, Ms. Wharton and Ms.

Hellman. Aloisio Aff. ¶13. Aloisio conducted an investigation, including individual meetings

with the three witnesses–Ms. Wharton, Ms. Hellman, and Ms. Johnson. *Id.* ¶¶14-15. Upon

concluding the investigation and reviewing plaintiff's personnel file "which was filled with

warnings for inappropriate and threatening behavior," Aloisio determined that the "correct course

of action was to terminate Mr. Harrison's employment." *Id.* ¶16. Plaintiff filed a grievance

which was held in November 2000 before Aloisio, Giordano, Ronald Stone, Vice President of

Human Resources, and Dennis Dowling, Executive Director of the Hospital. *Id.* ¶18. Dowling

and Stone determined that proper grounds existed for the termination and denied the grievance. *Id.* On December 7, 2000, Giordano advised plaintiff that his grievance had been denied. Harrison Tr. 355:17-20. When Giordano told plaintiff he could apply to work at a different hospital within the North Shore system on a per diem basis with a loss of benefits, plaintiff told him "Go f*** yourself." *Id.* at 356-57:8.

On December 19, 2000, plaintiff filed a charge with the New York State Division of Human Rights ("NYSDHR"). After his termination and the filing of his NYSDHR claim, plaintiff claims that he was retaliated against by defendant when they "blacklisted" him as he sought employment. Harrison Tr. 367:22-24. Specifically, Harrison claims that one employment agency employee told him that "they told us that you had an anger control problem," *id.* at 368:5-22, and that one of Harrison's potential employers asked him "who is this Karen Lisk?" *Id.* at 143:12-15. He states that he was unable to get another position until May 2003. *Id.* at 369:17.

On June 19, 2003, the NYSDHR issued a Determination after Investigation concluding that there was probable cause to believe NSUH engaged in unlawful discriminatory practices. *See* Williams Aff., Ex 5. On October 28, 2003, a Reopening Order was issued indicating that a "review of the file compels the conclusion that there was no evidence of discrimination" and directing that the case be reopened, remanded and dismissed. *Id.*, Ex. 7. A Determination and Order after Investigation was issued on December 29, 2003 that concluded there was no probable cause to believe that NSUH had discriminated against Harrison. *Id.*, Ex. 8. The EEOC adopted the findings of the state agency, closed its file, and issued a right to sue letter on February 6, 2004. *Id.*, Ex.9. Additional discussion regarding the mailing of the right to sue letter will follow below. On May 17, 2004, Harrison commenced this action claiming that defendant

discriminated against him because of his race in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §2000e et seq. An Amended Complaint dated September 27, 2004 was filed subsequently.

## DISCUSSION

### A. Summary Judgment Standards

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson,* 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *In re Blackwood Assocs., L.P.* 153 F.3d 61, 67 (2d Cir. 1998) and citing Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 128 (2d Cir. 1996). The applicable substantive law determines which facts are critical and which are irrelevant. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

The trial court's responsibility is "'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'" *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 522 (2d Cir. 1996) (quoting *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994)). When, however, there is nothing more than a "metaphysical doubt as to the material

facts," summary judgment is proper.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475

U.S. 574, 586 (1986).  "Rather, there must exist 'specific facts showing that there is a genuine

issue for trial' in order to deny summary judgment as to a particular claim."  *Jamaica Ash &*

*Rubbish,* 85 F. Supp. 2d at 180 (quoting *Celotex,* 477 U.S. at 322).  To defeat a motion for

summary judgment, "the non-moving party must provide this Court 'with some basis to believe

that his version of relevant events is not fanciful.'"  *Dove v. City of New York,* 2007 WL 805786,

at *4 (E.D.N.Y. Mar. 15, 2007)(quoting *Lee v. Coughlin,* 902 F.Supp. 424, 429

(S.D.N.Y.1995)(citation omitted)).

      A moving party may obtain summary judgment by demonstrating that little or no

evidence may be found in support of the non-moving party's case.  "When no rational jury could

find in favor of the nonmoving party because the evidence to support its case is so slight, there is

no genuine issue of material fact and a grant of summary judgment is proper."  *Marks v. New*

*York Univ.,* 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).  Moreover, the non-moving party "must

produce evidence in the record and 'may not rely simply on conclusory statements or on

contentions that the affidavits supporting the motion are not credible.'"  *Singh v. New York City*

*Off-Track Betting,* 2005 WL 1354038, at *1 (S.D.N.Y. June 8, 2005)(quoting *Ying Jing Gan v.*

*City of New York,* 996 F.2d 522, 532 (2d Cir. 1993)).  Where, however, evaluation of the non-

movant's proof rests on the credibility of the non-movant versus the movant, a genuine issue

exists and summary judgment cannot be granted.  "Where an issue as to a material fact cannot be

resolved without observation of the demeanor of witnesses in order to evaluate their credibility,

summary judgment is not appropriate."  *See* Wright, Miller & Kane*, Federal Practice and*

*Procedure,* Vol. 10A, §2726 (quoting Advisory Committee Notes to1963 amendment of Rule

56(e)).  With the summary judgment standards in mind, the court now turns to the issues

presented on this motion.

**B.      Timeliness of Plaintiff's Complaint**

As a threshold issue, defendant argues that all of plaintiff's claims are barred for failure to

timely file this case.  For a Title VII complaint to be timely, it must be filed within 90 days of

receipt by plaintiff of a right to sue letter from the EEOC.  42 U.S.C. §2000e-5(f)(1).  These time

limits should be treated "not as jurisdictional predicates, but as limitations periods subject to

equitable tolling."  *Johnson v. Al Tech Specialities Steel Corp.,* 731 F.2d 143, 146 (2d Cir. 1984)

(citing *Zipes v. Trans World Airlines,* 455 U.S. 385 (1982)).  It may be assumed that "a notice

provided by the government agency has been mailed on the date shown on the notice" and that it

was received three days later.  *Sherlock v. Montefiore Med. Ctr.,* 84 F.3d 522, 526 (2d Cir. 1996)

(citation omitted).   This presumption is rebuttable "by admissible evidence, such as an affidavit

by the claimant stating the actual date of receipt (or lack thereof)."  *Comrie v. Bronx Lebanon

Hosp.,* 133 F.3d 906 (2d Cir. 1998).

The EEOC closed its file and issued a right to sue letter on February 6, 2004.  On that

date, an investigator for the EEOC mailed the right to sue letter to Mr. Harrison at his home

address in Queens Village, New York.  Woodyard Aff., ¶3, DE [60].  Copies of the right to sue

letter were also sent to defendant NSUH and its counsel, Mark Gloade, on February 6th.  *Id.*  On

February 13, 2004, the EEOC mailed another copy of the right to sue letter to plaintiff's counsel.

*Id.* ¶4.  No reason has been offered for why plaintiff's counsel's copy of the letter was not

included in the February 6th mailings, nor why the EEOC sent counsel the letter seven days later.

According to the EEOC, none of the four mailings of the right to sue letter were returned by the

Post Office.  *Id.* ¶¶ 3-4.  Plaintiff claims to have never received a copy of the right to sue letter from the EEOC, but rather states that the first time he saw the letter was when his attorney sent him a copy.  Harrison Aff., ¶2.  Plaintiff's counsel's copy of this letter indicates that it was received on February 17, 2004,  Williams Aff., Ex. 9, and forwarded to plaintiff the next day. *Id.,* Ex. 10.

The complaint was filed on May 17, 2004.  Defendant argues that since the EEOC mailed the right to sue letter on February 6, 2004, it was presumably received by plaintiff on February 9, 2004, and thus the deadline for filing the complaint was May 10, 2004.[4]  Plaintiff, however, has testified in his deposition and by affidavit that he never received the initial right to sue letter, but that his counsel received a copy of the letter on February 17th and timely filed the complaint exactly 90 days later on May 17, 2004.

Plaintiff's evidence to rebut the presumption that he received the initial mailing is his sworn statement that he didn't receive the letter.  Case law suggests that submission of such an affidavit may be sufficient to rebut the presumption.  *See, e.g., Greenidge v. Ben Hur Moving & Storage, Inc.,* 2002 WL 1796812, at *3 (E.D.N.Y. Aug. 6, 2002) ("an affidavit by the claimant stating that [he] never received the right-to-sue letter sent by the EEOC may rebut the presumption of receipt"); *Pointer v. Columbia Univ.,* 1997 WL 86387, at *3 (S.D.N.Y. Feb. 28, 1997) ("[p]laintiff's affidavit in opposition to the motion is sufficient to rebut the presumption that she received the EEOC letter within three days of its initial mailing").  Similarly, courts have noted the absence of an affidavit from plaintiff as a significant factor in cases where the presumption was not successfully overcome.  *See Johnson,* 731 F.2d at 146 (upholding judgment

---

[4]The 90th day, May 9, 2004, fell on a Sunday.

for defendant where plaintiff refused to provide an affidavit containing his version of facts); *Loftin v. New York State Dept of Mental Health,* 2003 WL 221767, at * 1 (S.D.N.Y. Jan. 31, 2003) (complaint's allegations of non-receipt "absent any explanation or affidavit" are insufficient), *aff'd,* 80 Fed. Appx. 717 (2d Cir. 2003).

Defendant notes that no other mailings to plaintiff at his Queens Village address were allegedly lost and as such, plaintiff's testimony as to his failure to receive the right to sue letter is not credible. Defendant has not, however, provided any documentary support regarding the receipt by plaintiff of this specific piece of mail. *Cf., Marino v. National R.R. Passenger Corp.*, 1987 WL 11683, at * 3 (S.D.N.Y. May 26, 1987)(defendant produced documentary evidence regarding receipt of letter by certified mail). Thus, the issue is whether plaintiff's assertion that he did not receive the right to sue letter is sufficient to rebut the presumption that it was received by February 9, 2004.

Where the date of receipt of a right to sue letter is disputed, the court may hold an evidentiary hearing on that issue alone. *See Comrie,* 133 F.3d at 906. In light of the ruling on the remainder of defendant's motion, the court need not conduct such a proceeding at this time, and explicitly declines to make a determination whether plaintiff's affidavit alone suffices.

## C.    Title VII Claims

Harrison claims that he was discriminated against because of his race in violation of Title VII by defendant's failure to promote him, by subjecting him to a hostile work environment, by retaliating against him for making complaints about discriminatory treatment, and by ultimately terminating his employment. Defendant argues that, with the exception of his wrongful termination claim, all of plaintiff's claims are time barred because none of the events occurred

within 300 days of the filing of his discrimination charge in December 2000.

### 1. Wrongful Termination

Plaintiff claims that he was terminated on the basis of race in violation of Title VII, which prohibits an employer from engaging in the following practices with regard to a person's race: "To . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . ."  42 U.S.C. §2000e-2(a).

"The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met [his] burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason." *Stratton v. Dep't for the Aging for the City of New York,* 132 F.3d 869, 878 (2d Cir. 1997)(citations omitted).  The three-part burden shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), is used to analyze claims of discrimination under Title VII.  *See Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir. 1989)(citations omitted).  First, plaintiff must establish a *prima facie* case of discrimination based on race; if he does so, the employer bears the burden of articulating a legitimate, nondiscriminatory reason for plaintiff's dismissal; if the employer comes forward with such a reason, plaintiff must prove that the reason is a pretext and that discrimination was the actual reason for the dismissal.  *See Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir. 2000).

To establish a *prima facie* case of discrimination, Harrison must establish four elements: 1) that he is a member of a protected class; 2) that he was qualified for the position and performed his duties satisfactorily; 3) that he was subject to an adverse job action; and 4) that the

adverse job action occurred under circumstances giving rise to an inference of discrimination. *See Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir. 2000).  The burden of establishing a *prima facie* case has been characterized as "minimal."  *See Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir. 2000).  In this case, there is no dispute that plaintiff is a member or a protected class, or and that he was subject to an adverse job action, namely his termination.  Defendant argues, however, that plaintiff cannot establish a *prima facie* case as to the other two elements.

Regarding plaintiff's qualifications for his job, at this stage, plaintiff "need only make the minimal showing that [he] possesses the basic skills necessary for the performance of the job." *Gregory v. Daly,* 243 F.3d 687, 696 (2d Cir. 2001)(citations and internal quotation marks omitted).  This standard is consistent with the purpose of the qualification element "'to help eliminate[] the most common nondiscriminatory reasons for the plaintiff's rejection.'" *Id.* (quoting *Texas Dep't of Comty Affairs v. Burdine,* 450 U.S. 248, 254 (1981)).  Defendant argues that plaintiff's threats and harassing behavior rendered him unqualified because such behavior falls below the reasonable expectations of the employer.  The court finds that plaintiff has satisfied his minimal showing on this point.

The final element of plaintiff's *prima facie* case requires him to show that his termination took place under circumstances giving rise to an inference of discrimination based on his race.  A plaintiff can raise an inference of discrimination "by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham*, 230 F.3d at 39.   Plaintiff has not identified a single employee that was treated differently, no has he put forth any admissible evidence that others acted similarly but were not terminated.  Beyond his own statements, plaintiff's sole evidence that he

was treated differently is his reference to a statement that Elaine Johnson purportedly made to the investigator for the NYSDHR.  Johnson is reported to have said that it was common for people to become loud in the Human Resources office.  This comment is referenced by the investigator in the NYSDHR's initial report, which was ultimately rejected by that agency.  As an interim report of a government agency, statements contained in it do not fall within any exception to the rule against hearsay.  *See, e.g., City of New York v. Pullman Inc.,* 662 F.2d 910, 914-15 (2d Cir. 1981)(non-final agency report found to be inadmissible hearsay).   Plaintiff has provided no sworn statement from Ms. Johnson on this or any other aspect of his case.  Even if the statements were admissible, they do not establish that similarly situated employees were treated differently thereby raising an inference of discrimination.

Similarly, plaintiff has not shown there was any racial basis for his termination.  The Second Circuit has noted that "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."  *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985).  "The plaintiff's suspicions of discrimination in the absence of any supporting evidence cannot defeat a motion for summary judgment."  *Singh,* 2005 WL 1354038, at *11 (citing *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 456 (2d Cir. 1999)).  Absent any evidence beyond plaintiff's unsubstantiated suspicions or assumptions, he cannot prevail.

Plaintiff's evidence regarding defendant's racial animus is virtually non-existent.  The slim evidence of racial remarks offered by plaintiff is not temporally proximate to his termination in November 2000.  In fact, the only arguably racial remark identified by plaintiff is Lisk's calling him "boy" in 1989 and 1990.  He also suggests that his allegation that several security

officers referred to him as a drug dealer was somehow race-related. These comments were, at best, stray remarks made by persons who had no part in the decision to end his employment and thus are insufficient as evidence of discrimination. *See Minton v. Lenox Hill Hosp*., 160 F. Supp. 2d 687, 694 (S.D.N.Y. 2001). Even if they had been made by someone with the authority to terminate him, "stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001). On the record before it, the court can find no evidence that would allow a reasonable jury to conclude that defendant discriminated against plaintiff on the basis of his race.

Finally, even assuming plaintiff could make out a *prima facie* case of discriminatory termination, the defendant had a legitimate nondiscriminatory reason for firing him, namely his unprofessional and threatening behavior towards several employees on November 15, 2000. It is clear that an employee's disruptive conduct is a legitimate reason for termination. *See Holt,* 95 F.3d at 130; *McLean-Nur v. Dep't of Transp.,* 2000 WL 297176, at *6 (S.D.N.Y. Mar. 21, 2000). As one court summarized,

> Insubordination and threatening behavior both constitute legitimate non-discriminatory reasons for discharge in this Circuit, see, e.g., *Lindsay v. New York Univ. Med. Ctr.,* No. 00 Civ. 8476(DC), 2002 WL 48771, at *7-10 (S.D.N.Y. Jan.11, 2002), *aff'd* 2002 WL 31545959 (2nd Cir. Nov 15, 2002); *Adeniji v. Admin. for Children Servs.,* 43 F.Supp.2d 407, 438 (S.D.N.Y.1999), as does the inability to get along with supervisors and co-workers. *See, e.g., Meiri v. Dacon,* 759 F.2d 989, 997 (2nd Cir.1985) (A "profound inability to get along with ... coworkers ... represents a legitimate nondiscriminatory reason for an employment decision); *Thermidor v. Beth Israel Med. Ctr.,* 683 F.Supp. 403, 412 (S.D.N.Y.1988) (It is widely acknowledged that reasons such as ... conflicts with persons in positions of authority constitute legitimate nondiscriminatory reasons justifying discharge.).

*Rikhy v. AMC Computer Corp.*, 2003 WL 1618529, at *4 (S.D.N.Y. Mar. 28, 2003). Moreover,

an employer may legitimately terminate employment where the employee's conduct is insubordinate or disruptive, even if that conduct involves complaints of discrimination. *Matima v. Celli,* 228 F.3d 68, 79 (2d Cir. 2000). Defendant has identified numerous incidents of plaintiff's insubordinate and disruptive conduct, and conflicts with authority figures such as doctors, culminating with the November 2000 incident. Thus, the court finds that defendant has satisfied its burden of establishing a legitimate, race neutral reason for Harrison's termination.

Faced with legitimate, non-discriminatory reasons for his termination, the burden would fall upon plaintiff to establish that these reasons were pretext, and that his race was a motivating factor for defendant's act. Since the court has already found that his vague, conclusory allegations do not establish a prima facie case of discrimination, those same conjectures cannot establish pretext in the face of NSUH's race neutral reasons for terminating his employment. In short, plaintiff has presented no evidence that his race played any part in his termination.

## 2. Retaliation

In addition to claiming that he was terminated because of his race, Harrison claims he was fired in retaliation for voicing complaints regarding discrimination at the hospital. Retaliation claims brought under Title VII utilize a three step burden shifting analysis. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993). First, plaintiff must establish a *prima facie* case of retaliation by showing that he 1) participated in a protected activity known to the defendant; 2) that an adverse employment action was taken, disadvantaging plaintiff; and 3) that there is a causal connection between the protected activity and the adverse employment action. *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir. 1998). If plaintiff satisfies this initial burden, then the burden shifts to the defendant to proffer a non-retaliatory reason for the

18

adverse action.

Harrison essentially identifies two sets of protected activities and resulting retaliatory conduct. First, plaintiff claims he participated in protected activity by "voicing his opposition to discriminatory practices that were race-based, throughout his employment at the Hospital" and that defendant retaliated with various adverse actions culminating with his termination. Pl. Mem. in Opp., at 21. He alleges that his protected activities were retaliated against by various adverse actions such as being written up with "final warnings," being sent to "anger management," receiving reprimands, and ultimately being terminated. With the exception of his termination, each of these actions occurred in 1998 or earlier. The second protected activity identified by plaintiff was his post-termination filing of charges with the NYSDHR and EEOC.

a. Retaliation claims up to and including termination

Plaintiff must first establish that he engaged in protected activity and that defendant knew about that participation. Although the Amended Complaint states that he "went to" the NYSDHR to file a complaint in April 1993, Am. Compl. ¶49, there is no evidence that a complaint was actually filed prior to December 2000. Thus plaintiff is left with his claim that he repeatedly voiced his opposition to discriminatory treatment. Even "informal protests of discriminatory employment practices, including making complaints to management" can constitute protected activity. *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990). Although he fails to provide any of the particulars of such complaints, the court will assume for purposes of this motion that plaintiff can establish that he engaged in protected speech.

Plaintiff must next establish that his employer's conduct constituted an adverse

employment action that resulted in "a materially adverse change in the terms and conditions of employment." *Torres v. Pisano,* 116 F.3d 625, 640 (2d Cir. 1997). A materially adverse change must be "more disruptive than mere inconvenience or an alteration of job responsibilities" and can include "termination of employment, a demotion accompanied by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000) (citations omitted).

With the exception of plaintiff's termination, none of the employment actions allegedly taken against plaintiff rise to the level of an adverse employment action. Written reprimands that are not accompanied by a material change in plaintiff's working condition do not constitute an adverse employment action. *See Weeks v. New York,* 273 F.3d 76, 86 (2d Cir. 2001)("notice of discipline" not adverse employment action); *Valentine v. Standard & Poor's,* 50 F. Supp. 2d 262, 283 (S.D.N.Y. 1999)(negative evaluations alone are not cognizable). Defendant's referral of Harrison to anger management counseling also did not affect his working conditions in any way. Absent specific employment actions, "plaintiff's subjective perception that he was treated unfavorably is insufficient to demonstrate an adverse employment action." *Singh,* 2005 WL 1354038, at *8. Thus, the sole adverse action taken against plaintiff was his termination in November 2000.

The third element of a prima facie retaliation claim requires plaintiff to show a causal connection between the protected activity and the adverse action. Such a connection may be proved directly "through evidence of retaliatory animus directed against a plaintiff by the defendant," *DeCintio v. Westchester Cty Med'l Ctr.,* 821 F.2d 111, 115 (2d Cir. 1987), or

indirectly "by showing that the protected activity was followed closely by discriminatory treatment." *Id.* (citations omitted). Plaintiff has failed to demonstrate either an indirect or direct causal connection between his complaints and his termination.

An inference of retaliation can be made where the protected activity is followed shortly by the adverse employment action. It is clear, however, that the temporal proximity between protected activity and the adverse employment action must be very close to establish a causal connection. *Clark County School Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001). While there is no bright line marker, case law indicates that a gap of up to one to two months between the protected activity and the adverse action may establish the requisite causal connection. *See, e.g., Triglia v. Town of Manlius,* 313 F.3d 713, 721 (2d Cir. 2002 )(one month gap sufficient); *McGrory v. City of New York,* 2004 WL 2290898, at *7 (S.D.N.Y. Oct. 8, 2004)(one or two months "clearly sufficient"); *Ashok v. Barnhart,* 289 F. Supp. 2d 305, 315 (E.D.N.Y. 2003) (two month period "may permit a reasonable jury to find the acts to be temporally proximate and casually related"). Longer gaps, however, have been found to be too attenuated to establish a causal connection. *See, e.g., Butler v. Raytel Med. Corp.,* 2004 WL 1961522, at *4 (E.D.N.Y. Aug. 24, 2004)(one year); *Lambert v. New York State Office of Mental Health,* 2000 WL 574193, at *13 (E.D.N.Y. Apr. 24, 2000) (five months); *Cobian v. New York City,* 2000 WL 1782744, at *18 (S.D.N.Y. Dec. 6, 2000) (four months).

Plaintiff has not identified a concrete "complaint" made by him for which he was retaliated against, but rather suggests that he complained consistently throughout his employment. The most recent complaint allegedly initiated by plaintiff that can be surmised from the record concerns the promotion of Sandoval which, as will be discussed *infra,* occurred

in January 1999.  As this event occurred more than a year prior to plaintiff's termination, it is, as a matter of law, too remote to establish a causal connection between plaintiff's complaints and his firing.  The two events most temporally proximate to plaintiff's firing, Dr. Nalaboff's complaint in May 2000 and Dr. Warshawsky's complaint in July 2000, also occurred well prior to his termination in November 2000.

Even assuming plaintiff has established a prima facie case of retaliatory firing, defendant has offered a legitimate, non-discriminatory motive for his termination.  As discussed *supra,* an employee's disruptive conduct has been found to be a legitimate reason for termination.  *See Holt,* 95 F.3d at 130; *McLean-Nur,* 2000 WL 297176, at *6.  As to his use of the word "nigger," plaintiff argues that it was directed only at himself and not other employees.  Whether or not NSUH personnel misunderstood his use of the derogatory language is irrelevant so long as the decision to terminate him was not made for a discriminatory purpose.  "Even if [the employer's] decision to terminate plaintiff was informed by erroneous facts or mistaken beliefs, it was nevertheless based on non-discriminatory reasons."  *LaBella v. New York City Admin. for Children's Serv. ,* 2005 WL 2077192, at *18 (E.D.N.Y. Mar. 28, 2005); *see also Valentine,* 50 F. Supp. 2d at 290 ("an employer may fire an employee for a good reason, bad reason, a reason based on erroneous facts, or no reason at all, so long as its action is not based on a discriminatory reason")(citation omitted).  Since defendant has put forth a legitimate, non-discriminatory reason for Harrison's termination, the burden shifts back to plaintiff to establish that those reasons were pre-textual to retaliatory animus.

Plaintiff's attempts to overcome the legitimate reasons advanced by defendant are conjectural and fall short of the mark.  Again, he relies solely upon his statements that he was

discriminated against.  As discussed *supra,* he has provided no admissible evidence to support

his allegations.  "An assumption devoid of evidence to support it is conclusory," *Dowrich v.*

*Aramark Healthcare Support Serv., Inc.,* 2007 WL 2572122, at *9 (E.D.N.Y. Sept. 4, 2007), and

"mere conclusory allegations" cannot establish a pretext to defeat a motion for summary

judgment. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997). "Simply put, Plaintiff

has not provided any evidence from which a juror or this Court can infer that Defendants'

proffered reasons for Plaintiff's discharge were pre-textual to Defendants' alleged retaliatory

animus." *Wang v. State Univ. of New York Health Sciences Ctr. at Stony Brook,* 470 F. Supp. 2d

178, 186 (E.D.N.Y. 2006).  As plaintiff has put forth no evidence to show that defendant's

reasons for his termination were pretextual, there is no genuine issue of fact for a jury to

determine.

      b.  Post-termination retaliation claim

      Plaintiff also claims that after his termination and post-termination filing of charges with

the NYSDHR and EEOC, defendant retaliated against him for filing charges "by blacklisting

Plaintiff to future employers, and falsely stating that Plaintiff had anger management problems."

Pl. Mem. in Opp., at 22.  A terminated employee may be able to state a claim for retaliation "if,

for example, the company 'blacklists' the former employee, wrongfully refuses to write a

recommendation to prospective employers, or sullies the plaintiff's reputation." *Wanamaker v.*

*Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir. 1997)(internal citations omitted).

      Harrison's evidentiary support for this claim, however, is limited to his own testimony

that an employment agency employee told him that "they told us that you had an anger control

problem," Harrison Tr. at 368:5-22, and that one of Harrison's potential employers asked him

"who is this Karen Lisk?" *Id.* at 143:12-15. Even if these hearsay statements were admissible, there is no evidence that they contributed to a potential employer's decision not to hire plaintiff. Where "there is no admissible evidence that the statements of the former employer caused or contributed to the rejection by the prospective employer, the plaintiff has failed to present a prima facie case." *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999). Since Harrison has not established a prima facie case of post-termination retaliation, that claim must also fail.

### 3. Failure to Promote

EEOC filing deadlines "'protect employers from the burden of defending claims arising from employment decisions that are long past.'" *Ledbetter v. Goodyear Tire & Rubber Co.,* 127 S.Ct 2162, 2171 (2007)(*quoting Delaware State Coll. v. Ricks,* 449 U.S. 250, 256-57 (1980)). Judge Wexler's M&O ruled that plaintiff's failure to promote claims were limited to promotions allegedly denied him within 300 days prior to the filing of the charge with the EEOC, and that defendant's alleged failure to promote plaintiff in October 2000 was the only viable allegation. The charge was filed on December 19, 2000, and thus the cut-off period is 300 days prior to that date, or February 23, 2000.

According to plaintiff, Carlos Sandoval received a promotion over him in October 2000. Am. Compl. ¶66. Plaintiff has not provided any evidence to substantiate this allegation beyond his bare allegation and has not provided any corroborating evidence such as Mr. Sandoval's testimony or documentary proof. Defendant has provided an affidavit from John Aloisio, Director of the Department of Radiology, that attaches a transfer order for Mr. Sandoval. *See* Aloisio Aff, Ex. 12 (the "Sandoval transfer order"). That order is dated September 25, 1998 and

indicates that Mr. Sandoval's transfer was approved on that date and made effective January 19, 1999.

In his opposition papers, plaintiff argues that the Sandoval transfer order "is inadmissible, in that it was never produced in discovery/document production, is not bate-stamped, and the defendant's [sic] failed to disclose the existence of this document in their Federal Rule 26 Automatic Disclosure Statement." Pl's Mem. in Opp., at 14 (emphasis removed). Plaintiff fails to identify the document demand that allegedly would have required production of the transfer order, nor did he make a motion pursuant to Rule 37 of the Federal Rules of Civil Procedure. Significantly, upon receiving the document, plaintiff failed to ask the court for further discovery of any sort concerning the document, but rather elected to rely upon his own, unverified statement to contradict this documentary proof. Plaintiff's bare allegation that Sandoval was promoted in October 2000 is devoid of any context that would give it weight. No reference is made to why plaintiff believes October 2000 is the correct date, he simply declares that it is.

"Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case." *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir.2003) The court finds there is no material issue of fact regarding Mr. Sandoval's transfer. This transfer occurred outside the 300 day period preceding the EEOC filing, and therefore any allegation of discrimination arising from that transfer is time barred. Accordingly, NSUH's motion for summary judgment on this claim is granted.

### 4. Hostile Work Environment claim

Two essential elements must be proven to establish a *prima facie* case of hostile work environment. First, the conduct must be "sufficiently severe or pervasive to alter the conditions

of the victim's employment and create an abusive work environment." *Harris v. Forklift Sys.,* 510 U.S. 17, 21 (1993). Plaintiff must also establish that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir. 1997). As a threshold issue, however, the court must determine whether plaintiff's claims of hostile work environment are time barred.

As discussed *supra,* "[a] plaintiff may bring a claim under Title VII only for acts of discrimination that occurred within the statutory period set forth by 42 U.S.C. §2000e-5(e)(1)," *Patterson v. County of Oneida,* 375 F.3d 206, 220 (2d Cir. 2004), in this case, the 300 day period from February 23, 2000 to December 19, 2000. The only allegedly discriminatory conduct claimed by plaintiff during this time period was his termination in November 2000.[5] Unlike failure to promote claims, hostile work environment claims "are based on the cumulative effect of individual acts" and that "the acts constituting a hostile work environment are part of one unlawful employment practice." *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 118 (2002). "Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir. 1993). Plaintiff suggests that "the racially derogatory comments throughout the 1990's [are] relevant, actionable, and not time-barred." Pl. Mem. in Opp., at 20.

However, to utilize the continuing violation exception, "a plaintiff must at the very least

---

[5]The only other conduct identified by plaintiff was defendant's promotion of Carlos Sandoval that he alleges occurred in October 2000. As addressed in the previous section of this memorandum, the evidence compels a finding that Sandoval's promotion took place in 1999.

allege that one act of discrimination in furtherance of the ongoing policy occurred within the limitations period." *Patterson,* 375 F.3d at 220. "A claim of hostile work environment is timely so long as one act contributing to the claim occurred in the statutory period." *Id.* Harrison has failed to allege a single act contributing to his hostile work environment claim that occurred within the 300 days prior to December 19, 2000. Accordingly, his hostile work environment claim is time barred.[6]

## CONCLUSION

In sum, there is no evidence in the record upon which a jury could reasonably conclude that the defendant discriminated against plaintiff on the basis of his race or in retaliation for a protected activity. Thus, the defendant's motion for summary judgment is granted, and the Clerk of the Court is directed to close the case.

Dated: Central Islip, New York  
       March 6, 2008

**SO ORDERED:**

/s/ William D. Wall_____  
WILLIAM D. WALL  
United States Magistrate Judge

---

[6]The court notes that even if plaintiff were somehow able to bootstrap the events from the 1990s onto a viable claim, those incidents would be too remote and disjointed to constitute a hostile work environment since allegedly harassing incidents "must be repeated and continuous; isolated acts or occasional episodes will not merit relief." *Kotcher v. Rosa & Sullivan Appliance Ctr.,* 957 F.2d 59, 62 (2d Cir. 1992)(citations omitted). Indeed, Lisk's alleged reference to him as "boy," the sole incident that arguably was raced based, occurred in 1989 and 1990. Plaintiff has provided no evidence that any of the incidents were related to his race and therefore constituted discriminatory harassment. *See Singh,* 2005 WL 1354038, at * 12 (discrete acts of allegedly discriminatory treatment are insufficient to sustain a claim of hostile work environment).